In the Matter of J.R.S.

**VILLAGE OF CHALKYITSIK, Appellant,**

v.

**M.S.F. and J.J.G., Adoptive Parents, Appellees.**

**Nos. 7421, 7422.**

Supreme Court of Alaska.

Sept. 14, 1984.

Michael J. Walleri, Fairbanks, for appellant.

D. Rebecca Snow, Asst. Atty. Gen., Fairbanks, Norman C. Gorsuch, Atty. Gen., Juneau, for appellee, State of Alaska.

Daniel L. Callahan, Schendel Law Office, Fairbanks, for appellees, M.S.F. and J.J.G.

Raymond Funk, Asst. Public Defender, Fairbanks, Dana Fabe, Public Defender, Anchorage, Guardian Ad Litem.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Judge.

## OPINION

Dissatisfied with the ways in which state courts treat Indian parents and children, Congress enacted the Indian Child Welfare Act. This case requires us to interpret several of that Act's provisions.

### I.

J.R.S., the child whose status and future are at issue in this appeal, was born nine years ago in the Fort Wainwright army hospital in Fairbanks, Alaska. His mother soon moved with him to Louisiana, but problems developed and the State of Louisiana took custody of him in September 1976. Since then he has been in and out of foster homes. His maternal grandmother has cared for him in Chalkyitsik, Alaska, and

he has lived with his mother in Fairbanks. Alaska's Division of Family and Youth Services has placed him with various Fairbanks foster parents. In the summer of 1982, he was placed with relatives living on the Kenai Peninsula. Most recently, J.R.S. has lived with appellees M.S.F. and J.J.G., who adopted him in December 1982.

The legal proceedings which give rise to this appeal began in April 1981, when the State filed a Petition for Adjudication of a Child in Need of Aid. Pursuant to AS 47.10.010(a)(2) and AS 47.10.080(c)(1), the superior court granted the petition and placed J.R.S. in the custody of the Division of Family and Youth Services. In October, the Division sent him to live with M.S.F. and J.J.G. In November, the superior court reaffirmed and extended its order. In March 1982 the State filed a Petition for Termination of Parental Rights, relying on AS 47.10.080(c)(3). Its petition pointed out that J.R.S.'s natural father had not demonstrated even minimal parental interest in the child and that his natural mother, M.C.H., had emotionally abused her son. The natural father, who was living in Pennsylvania, did not contest the petition. M.C.H., J.R.S.'s natural mother, eventually signed a Relinquishment of Parental Rights. She asked the court to send her son to relatives living on the Kenai Peninsula, and this was done in June 1982. For reasons not relevant here, this placement was not successful, and the Division of Family and Youth Services returned J.R.S. to M.S.F. and J.J.G. They petitioned to adopt him, and the superior court granted their petition in December of 1982.

For purposes of this appeal, the final two months of this process are the most important. In early October, as the Division prepared to return J.R.S. to Fairbanks, the Village of Chalkyitsik formally intervened

in the Child in Need of Aid proceeding and asked for an order blocking the move. Although the superior court refused to issue the temporary restraining order, no party now contends that the Village of Chalkyitsik had no right to intervene. Under the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq., [hereinafter I.C.W.A.], Chalkyitsik is J.R.S.'s "tribe," and the Act gives such tribes the right to intervene in "any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child...." 25 U.S.C. § 1911(c).[1] The Child in Need of Aid action had begun as a foster care placement proceeding and had then become a proceeding for termination of parental rights; the parties thus assumed, perhaps incorrectly, that 25 U.S.C. § 1911(c) decided the question.[2]

The fact of the Village's intervention in the C.I.N.A. action did not, in the superior court's view, entitle it to participate in the hearing on M.S.F. and J.J.G.'s petition to adopt J.R.S. The Village's motion to intervene in the adoption action—a proceeding separate from the C.I.N.A. action and governed by a different statute[3]—was denied. On the morning of the adoption hearing, counsel for Chalkyitsik filed a document, signed by M.C.H., purporting to revoke her Relinquishment of Parental Rights. The superior court refused to give effect to this revocation, proceeded with the adoption hearing, and granted the adoptive parents' petition. Contending that it should have been allowed to intervene and that the revocation should have been given effect, Chalkyitsik brings this appeal.

## II.

When M.C.H. relinquished her parental rights, a hearing at which those rights might have been terminated involuntarily was scheduled to be held in five days; how-

---

1. Because it is a recognized "Native village" under 43 U.S.C. § 1602(c) (§ 3(c) of the Alaska Native Claims Settlement Act), Chalkyitsik is an "Indian tribe" for the purposes of the Indian Child Welfare Act. 25 U.S.C. § 1903(8). It is J.R.S.'s "tribe" because his natural mother is from Chalkyitsik and he has become a member of the Village. See 25 U.S.C. § 1903(4) and (5).

2. See note 11 *infra* and accompanying text.

3. See AS 25.23.010–.240 (adoption); AS 47.10.-010–.290 (delinquent minors and children in need of aid).

ever, the record shows that she was not coerced into signing relinquishment papers and the superior court found that the relinquishment was voluntary. Twenty days after the relinquishment was entered, the superior court entered an order terminating her parental rights. More than five months later, long after the time during which state law allows a natural parent to revoke a relinquishment had run,[4] M.C.H. signed a one-sentence statement purporting to revoke the relinquishment she had executed. To decide what effect, if any, to give to this document, the superior court relied upon 25 U.S.C. § 1913(c), which provides:

> In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent.

The superior court reasoned that consent to the termination of one's parental rights could not be withdrawn after a final decree terminating them had been entered, noted that its own order was such a decree, and held that the purported revocation had no legal effect.

We will assume for purposes of argument that the Village has standing to raise the issue of the validity of M.C.H.'s revocation of her relinquishment. M.C.H. has not appealed from any of the superior court's orders, and the State quite plausibly contends that the right 25 U.S.C. § 1913(c) confers belongs to M.C.H., not to her tribe. Although 25 U.S.C. § 1914 allows a tribe to petition any court of competent jurisdiction to invalidate an action which violates certain I.C.W.A. provisions, including section 1913(c), Chalkyitsik does not claim that this appeal is a § 1914 petition. If the Village had filed a § 1914 petition in superior court, however, the petition would presumably have been denied and an appeal to us from that denial would have been proper.[5]

Thus, we will treat this issue as if the Village had in fact fulfilled the Act's procedural requirements. In light of the manner in which we interpret § 1913(c), this does not affect our resolution of this issue.

■ We first hold that § 1913(c) applies to the case before us. The State argues that M.C.H.'s relinquishment of parental rights was entered to avoid the trouble of an adversary proceeding and that such a relinquishment is not really "voluntary"; section 1912 of the Act, which governs involuntary proceedings, would thus be applicable, and § 1912 does not allow a natural parent to revoke anything. In our view the state's argument is without merit. The superior court believed the relinquishment was governed by the provisions of § 1913, and the papers the State prepared for M.C. H.'s signature refer to Alaska statutes which deal with voluntary relinquishments of parental rights. Her counsel and the superior court explained these papers to her, and the superior court expressly found that "everything's being done voluntarily and with an understanding of the situation." Moreover, 25 U.S.C. § 1912(f) provides that

> No termination of parental rights may be ordered in [an involuntary] proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Because the superior court never made such a determination, any order terminating parental rights under § 1912 would have been invalid.

■ However, we do not believe that § 1913(c) allows a parent to withdraw a voluntary relinquishment of parental rights after a final order terminating those rights has been entered. Section 1913(c) applies

---

**4.** See AS 25.23.180(b)(1) and (g).

**5.** By its terms § 1914 allows a tribe to petition against "any violation" of sections 1911, 1912 and 1913.

to two kinds of proceedings: to voluntary proceedings for termination of parental rights and to voluntary proceedings for the adoptive placement of Indian children. The consent it refers to may be one of two kinds: a consent to termination of parental rights or a consent to adoptive placement. A consent to termination may be withdrawn at any time before a final decree of termination is entered; a consent to adoption at any time before a final decree of adoption. If Congress had intended consents to termination to be revocable at any time before entry of a final decree of adoption, the words "as the case may be" would not appear in the statute. Therefore, if the superior court's order was a final order, M.C.H.'s purported revocation was without legal significance.

■■■ The superior court's order was "final" for purposes of the Act. This is not a case in which a parent attempts to revoke a relinquishment before her child has been placed for adoption. AS 25.23.180(g), which provides that a decree terminating parental rights may be vacated if a child has not been placed for adoption and the person having custody agrees to the decree's vacation, is not relevant here. Noth-

ing in the statute governing relinquishment suggests that the decree the superior court entered was anything less than final. A different statute, AS 47.10.080(f), provides that orders terminating parental rights involuntarily are reviewable when good cause is shown, see *Rita T. v. State*, 623 P.2d 344 (Alaska 1981), but this does not necessarily mean that they are not final orders. In any event the order entered in this case followed a voluntary relinquishment. In our view the superior court's order was as final as any other final judgment. The mere fact that a party can attack such final orders on Civil Rule 60(b) grounds does not change the final character of the order in question. Because the superior court's order was final, that court correctly refused to give effect to M.C.H.'s attempt to revoke her voluntary relinquishment of parental rights.

## III.

■■■ At J.R.S.'s adoption hearing, all participants agreed that the placement preferences the Indian Child Welfare Act establishes [6] should be set aside to allow M.S.F. and J.J.G. to adopt J.R.S. The Village of Chalkyitsik, the placement prefer-

---

**6.** Relevant parts of 25 U.S.C. § 1915 are:
§ 1915. Placement of Indian children
 (a) Adoptive placements; preferences
 In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.
 (b) Foster care or preadoptive placements; criteria; preferences
 Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
 (i) a member of the Indian child's extended family;
 (ii) a foster home licensed, approved, or specified by the Indian child's tribe;

 (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
 (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
 (c) Tribal resolution for different order of preference; personal preference considered; anonymity in application of preferences
 In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: *Provided,* That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.

ence system's most obvious defender,[7] was not represented at the hearing. This was not by choice. The superior court had denied the Village's motion to intervene in the adoption proceeding. We hold that for this reason the superior court's decision to set aside the placement preference system was fatally flawed. The adoption it approved must be vacated and the matter remanded for an adoption hearing at which the Village will be allowed to intervene.

■■■ The Act itself does not give a tribe the right to intervene in an adoption proceeding. Nor was such a right explicitly recognized in *E.A. v. State*, 623 P.2d 1210 (Alaska 1981). Further, there are technical defects in the way the Village presented its most persuasive argument— that, under a combination of state and federal law, it has such an important interest in what happens to J.R. that it was entitled to intervene as of right in the adoption proceeding. Nevertheless we conclude that the Village's interest is substantial and the alternatives to requiring intervention unacceptable. If Indian tribes are to protect the values Congress recognized when it enacted the Indian Child Welfare Act, tribes must be allowed to participate in hearings at which those values are significantly implicated.

In regard to the subject of intervention, the I.C.W.A. (25 U.S.C. § 1911(c)) provides:

State court proceedings; intervention

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

Foster care placement and termination proceedings are defined in 25 U.S.C. § 1903(1) of the Act:

(1) "child custody proceeding" shall mean and include—

(i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;

(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;

(iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and

(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents.

The Act thus distinguishes between "adoptive placement" and "termination of parental rights"; only in the latter case does § 1911(c) support intervention. In short, we think Congress recognized that terminations and adoptions might be handled in separate actions. In Alaska, for example, the two proceedings are fundamentally different. *Compare* AS 47.10.080 with AS 25.23.100–.120.[8] If Congress be-

---

**7.** If a child is to be adopted, tribal members who want to adopt him are entitled to preference over other Indians, who in turn are preferred to non-Indians. Foster homes specified or licensed by the tribe are preferred to other foster homes. The tribe is authorized to vary § 1915's placement preferences by resolution. In its own right and as the representative of its members, it has a strong interest in the important role § 1915 gives it.

**8.** Two witnesses mentioned the Alaska system in testimony before the House subcommittee which held hearings on the Act. See Proposed Indian Child Welfare Act: Hearings on S. 1214 before the House of Representatives Subcommittee on Indian Affairs and Public Lands of

lieved that a tribe which had intervened in a termination proceeding would automatically be allowed to participate in an adoption proceeding, the Act it passed does not reflect this belief.

■ Yet neither the Act nor its legislative history establishes the contrary position the adoptive parents present: that Congress implicitly forbade state courts to allow tribes to intervene in adoptive proceedings. We accept for purposes of argument that Congress has this power, but can ascertain no evidence that it has chosen to exercise it. The Act does not purport to restrict state courts' authority to allow intervention. To find such a restriction, we would have to rely on the "expressio unius" ("expression of one thing is the exclusion of another") maxim, and that maxim, as the Sutherland treatise warns, "requires great caution in its application, and in all cases is applicable only under certain conditions." 2A Sands, *Sutherland Statutory Construction* § 47.25, at 132 (4th ed. 1973). Section 1911(c) grants a right that might not otherwise exist. It restricts the right it grants to two classes of cases. But not all of Chalkyitsik's intervention arguments depend on this right; instead, the Village claims that state law requires trial courts to allow intervention in cases like the one before us. On this question we do not think § 1911(c) offers any guidance. We therefore conclude that the Indian Child Welfare Act does not limit a state court's power to allow intervention in child custody proceedings. *See Matter of Appeal in Maricopa County Juvenile Action No. A–25525,* 136 Ariz. 528, 667 P.2d 228, 233 (1983).[9]

Our decision, then, depends on state law. Chalkyitsik contends that, in *E.A. v. State,* 623 P.2d 1210 (Alaska 1981), we have al-

ready resolved this issue in its favor. Although *E.A.* does not resolve the issue, we think that *E.A.* supports a decision to allow tribal intervention.

*E.A.*'s facts presented this court with a peculiar problem. Although the natural mother's parental rights had been terminated before the I.C.W.A. took effect, the children involved were physically placed for adoption after the Act's effective date. By its terms the Act did not affect

> a proceeding under State law for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement which was initiated or completed prior to one hundred and eighty days after November 8, 1978,

(25 U.S.C. § 1923)

but did apply to "any subsequent proceeding in the same matter or subsequent proceedings affecting the custody or placement of the same child." *Id.* The child's grandparents, trying to defend their preference rights under the I.C.W.A.,[10] asserted that physical placement for adoption was a 'subsequent proceeding' in the process of finding an adoptive home for their grandchild. We rejected this contention, holding that the whole adoptive placement process was a single proceeding, and the proceeding had begun before the Act's effective date. Thus the I.C.W.A. did not apply.

Chalkyitsik now argues that the *E.A.* case had begun as a termination-of-parental-rights case; that *E.A.* held that adoption proceedings were part of the termination action; therefore that the Village, having successfully intervened in the termination action against M.C.H., should properly have been part of the adoption action. Alternatively, it notes that *E.A.* held that a

---

the Committee on Interior and Insular Affairs, 95th Cong. 2d Sess. at 87 (Sister Mary Clare) and 93 (Don Mitchell).

**9.** We have reviewed the Act's legislative history and find nothing in it to cast doubt on this conclusion. Subsection 1911(c) was a late addition to the bill which became the Act. The House hearings which preceded its inclusion do not mention any need to exclude tribes from

adoption proceedings. The relevant House committee report does not explain why § 1911(c) distinguishes among types of child custody proceedings. *See* Hearings, *supra* note 8; H.R.Rep. No. 1386, 95th Cong., 2d Sess., *reprinted at* 1978 U.S.Code Cong. & Ad.News 7530–68.

**10.** See note 6 *supra.*

later adoption hearing would be "a subsequent proceeding in the same matter" as the earlier adoptive placements, and maintains that a party who has intervened in one phase of a "matter" cannot be excluded from subsequent phases.

These are complex questions, but the answers the Village offers are unsound. First, the "process" *E.A.* finds indivisible is the process of locating an adoptive home for the children involved, *not* the C.I.N.A. action taken as a whole. In *E.A.* we specifically stated that this process "was initiated upon the termination of E.A.'s parental rights ... and cannot be considered a subsequent proceeding or a discrete phase of the same matter." 623 P.2d at 1215. In that decision, the termination action was separate from the placement proceedings.[11] Second, *E.A.* involved an interpretation of the I.C.W.A.; no litigant briefed the question of whether or not C.I.N.A. actions and subsequent adoption proceedings had merged. Finally, an assertion that a C.I.N.A. action and an adoption proceeding involve the "same matter"—the status and future of a child—is not determinative of the question of who should be allowed to intervene.

*E.A.* does indeed support the Village, but its support applies to a slightly different question. Although in that case the children's grandparents were not allowed to appeal under the I.C.W.A., we did reverse and remand on other grounds; and the grandparents were held to have a right to be part of subsequent proceedings upon remand:

11. Therefore, under *E.A.*, the parties probably should not have assumed that the I.C.W.A. explicitly gave Chalkyitsik the right to intervene in the C.I.N.A. action at a time when that action was no longer a proceeding for "termination of parental rights"; instead, the C.I.N.A. action had become a proceeding for "preadoptive placement," and § 1911(c) does not grant a right of intervention in such proceedings. Because the tribe has an important interest in these proceedings, it would be entitled to intervene under state law. *See* text at pp. 17–19.

12. In Alaska, blood relatives of Native parents have two sets of rights: those given by AS 47.-10.230(e) ("A child may not be placed in a foster home or in the care of an agency or institution

In order that the grandparents may effectively assert their statutory right to preference at such proceedings, we further hold that they have a due process right to notice and an opportunity to be heard at any adoptive proceedings which may be conducted in the future.

623 P.2d at 1215–16.

In other words, the children's grandparents were to be allowed to intervene to protect rights the I.C.W.A. had given them.[12] Because grandparents' rights differ from the tribe's rights—the I.C.W.A. entitles the tribe to influence over adoptive placements, not to adoptive rights themselves—*E.A.* does not require courts to allow tribes to intervene in adoption hearings. Yet it does strongly indicate that state-law intervention protects rights granted by the Act. If the Village of Chalkyitsik had an "interest" in what happened to J.R. which paralleled the "interest" possessed by the *E.A.* grandparents, then the superior court should have allowed the Village to intervene.

▆▆▆ Although *E.A.* justified the rights it gave to the grandparents in terms of "due process," we think, so far as intervention is concerned, an analysis focused on the requirements of our Civil Rule 24 is appropriate. A.R.C.P. 24 provides in pertinent part:

*Rule 24. Intervention.*

(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action when the applicant claims an interest relating to the

providing care for children if a blood relative exists who requests custody of the child" and no one shows that this custody would harm the child; the section does *not* apply to adoptive placements) and those given by the I.C.W.A. ("In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families," 25 U.S.C. § 1915(a)). For the grandparents the only rights at stake in the adoptive hearing *E.A.* contemplated would have been the I.C.W.A. rights.

property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) *Permissive Intervention.* Upon timely application anyone may be permitted to intervene in an action when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

To decide whether or not a litigant is entitled to intervene in an action as of right, we look to the "interest" he claims, the extent to which "disposition of the action may as a practical matter impair or impede his ability to protect that interest," and the possibility that the interest is "adequately represented by existing parties." Our study convinces us that the superior court erred in denying the Village's motion to intervene.

 "[T]he Act envisions that Indian tribes are to play a central role in custody proceedings involving Indian children ...." *Matter of Appeal in Maricopa County, supra,* 667 P.2d at 233. By resolution, a tribe may alter the placement preference system the I.C.W.A. establishes. 25 U.S.C. § 1915(c). If it licenses or approves a foster home, that foster home is entitled to preference when a state agency tries to place a child associated with the tribe. 25 U.S.C. § 1915(b). When an adoption takes place, tribal members are also entitled to preference. § 1915(a). Tribes are entitled to inspect records showing how state agencies have placed Indian children. § 1915(e). Each of these provisions re-

flects Congress's concern for "the essential tribal relations of Indian people," "the stability and security of Indian tribes," and "the unique values of Indian culture." In the Act Congress specifically found that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe. 25 U.S.C. § 1901, 1902. In the instant case we conclude that Chalkyitsik has an "interest" which Rule 24(a) is designed to protect.[13]

 We also hold that intervention was necessary to preserve this interest. An Indian tribe may petition a state court to set aside actions which violate Indian parents' rights or improperly take jurisdiction from a tribal court, but the I.C.W.A. does not provide for the filing of such a petition if a state ignores § 1915's adoptive preferences. *See* 25 U.S.C. 1914. Procedurally, the tribe must intervene if it is to defend the Act's preference system. In this regard we reject the adoptive parents' argument that Chalkyitsik should have used its presence in the C.I.N.A. action to move for an order requiring the state to withhold its consent from the adoption. This is a needlessly roundabout scheme and the adoptive parents cite no cases requiring it.[14] It is obvious from the record that a "good cause" determination was made at the adoption hearing. This suggests that the appropriate place to oppose such a determination is the hearing itself. By refusing to allow this kind of opposition, the superior court made it inevitable that the Village's interests would be impaired.

Nor were the Village's interests represented by existing parties. State attorneys represented the Division of Family and

---

**13.** Moreover, when it attempted to intervene the Village of Chalkyitsik said it was trying to protect the rights of two Chalkyitsik families, both of which had expressed interest in taking J.R.S. into their homes. It thus had both an individual and a fiduciary reason to intervene in the adoption proceeding.

**14.** Moreover, it has problems of its own: the adoptive parents, for example, might justly want to intervene in a C.I.N.A. action in which the State's consent was at stake.

Youth Services. Adoptive parents M.S.F. and J.J.G. had interests adverse to the Village's. One possible representative of the Village's interests would have been the guardian ad litem. But under Alaska law the guardian's task is to promote the child's best interests. As a practical matter these interests will often differ from the tribe's; the record suggests that they were different here. The guardian represented J.R.S., not the Village. The guardian did not defend the Act's preferences. Only one potential litigant was ready to defend the Act's placement scheme, and the superior court excluded that litigant from the adoption hearing at which these statutory preferences were overridden. We hold that it was error on the superior court's part not to permit Chalkyitsik to intervene and we thus remand for a hearing at which the Village will be a party.[15]

The judgment of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED.

COMPTON, Justice, dissenting in part.

This court has concluded that an Indian tribe has a *right* to intervene in adoption proceedings, notwithstanding the fact that it is not asserting or protecting any particular right or interest created under ICWA. The only interest that can be gleaned from the record before us is what I would term a "general oversight" interest. As such, it is not given specific protection by ICWA, nor may it be reasonably inferred. Since there is simply no support for the court's conclusion, I dissent.

The court notes that ICWA does not itself give an Indian tribe the right to intervene in adoption proceedings. It also notes that *E.A. v. State*, 623 P.2d 1210 (Alaska 1981), confers no such right. It cannot cite a case from any jurisdiction which has held that such a right exists. The court then seeks refuge in Civil Rule 24(a) by declaring that the Indian tribe's interest—protecting values Congress recognized in enacting ICWA—is so substantial as to constitute an "interest" entitling the Indian tribe to intervention as a matter of right. This is the only way the court can justify the result, which is otherwise unsupportable.

To emphasize the Indian tribe's pervasive interest, the court cites *Matter of Appeal in Maricopa County Juvenile Action No. A–25525*, 136 Ariz. 528, 667 P.2d 228 (1983), conveniently ignoring the fact that the Indian tribe's intervention in that adoption proceeding was permissive, and therefore discretionary, not as of right. *Id.* at 233. In noting specific rights and obligations ICWA gives to and places upon Indian tribes, the court does nothing more than state the obvious. No one can quarrel with what ICWA says.

ICWA grants an Indian tribe a statutory right of intervention in certain instances not here applicable. *See* 25 U.S.C. § 1911(c). Further, it establishes certain adoption preferences, 25 U.S.C. § 1915(a), and grants an Indian tribe the right to alter by resolution those preferences. 25 U.S.C. § 1915(c). If a state court attempted to disregard a preference, then it is obvious that the person asserting it would be enti-

---

**15.** Arguments based on Civil Rule 24 were properly before the superior court and they are properly before us. When Chalkyitsik tried to intervene, it mistakenly cited Civil Rule 19 (mandatory joinder), arguing that because it was a necessary party the case could not go forward without it. Civil Rule 19 parallels Civil Rule 24: the same "interest" and "impair and impede" tests run through both rules. See 3A Moore's Federal Practice § 19.01–1[5.–6] at 19–26—19–31 (1982) (examining "complex" relationship between Rules 19 and 24). Thus a Rule-24-like motion was before the superior court. Chalkyitsik's Notice of Appeal did indeed refer vaguely to the Civil Rules, although its references to "permissive intervention" seem directed toward Rule 24(b). On the other hand, the Village's position throughout its appellate briefing has been consistent. A Civil Rule 24(a) discussion occupies eight pages of its first brief and four pages of its second. Counsel for the adoptive parents cannot justly claim to be surprised. Because the arguments Chalkyitsik raises here were presented to the trial court and mentioned in the Notice of Appeal, we have considered them. There is therefore no reason to reach Chalkyitsik's elaborate arguments concerning its "sovereign" right to intervene and its "parens patriae" relationship to J.R.S.

tled to use the procedural device established by Civil Rule 24(a) to assure that the person's statutory right was vindicated. Likewise, if a state court refused to honor a tribal resolution altering the statutory preference, the Indian tribe would be entitled to enforce compliance, and Civil Rule 24(a) would be the appropriate procedural device to gain access to the state court. In this case, however, *no* statutory right is being denied any person or the Village of Chalkyitsik. No member of J.R.S.'s extended family is seeking to adopt him. No member of J.R.S.'s Indian tribe is seeking to adopt him.[1] The Village of Chalkyitsik has not by resolution altered the statutory preference, and hence the state court is not refusing to honor any statutory right given an Indian tribe.

Civil Rule 24(a) requires both an "interest" and action that would impair or impede that "interest." No statutorily created interest is here being impaired or impeded, nor is any interest asserted by the Village of Chalkyitsik one that has been statutorily created, or recognized by prior decisions of our court. In fact, as stated previously, the only interest herein asserted is a "general oversight" interest. The tribe may have an interest in seeing that a child is not adopted by a non-tribal family but this interest has not been recognized by ICWA. The court is, in essence, granting tribes a right to intervene in *any* Indian child adoption proceeding, regardless of whether or not the placement preference scheme is involved. Though the court makes much of defending the placement preference scheme, it cannot point to any valid evidence [2] that the placement preference scheme was at issue in this case.

Because the federal government has determined that Indian tribes should play a central role in custody proceedings involving Indian children—a proposition with which I do not quarrel—this court has judicially created substantive *state* law which it then proceeds to recognize as an "interest" entitling the Indian tribe to intervene in adoption proceedings as a matter of right. Since no federally created statutory interest is being impaired or impeded in these proceedings, I can only wonder at the breadth of the oversight powers being here granted. Had Congress intended such a result, saying so would have been supremely simple.

---

1. The court attempts to bolster its position by claiming that the Village of Chalkyitsik was trying to protect the interests of two Chalkyitsik families who expressed an interest in taking J.R.S. into their homes. First, there is no evidence of this in the record. Counsel stated that at one time the Simon Francis family had indicated an interest in taking J.R.S. into their home; however, they left the village for the winter. On the day before the adoption hearing, counsel stated that the Peter Druck family was interested in taking J.R.S. into their home. Statements of counsel in memoranda or argu-

ment are not evidence. *See Weaver Brothers, Inc. v. Chappel,* 684 P.2d 123, at 126 (Alaska June 29, 1984). Second, counsel did not state that either family ever expressed any interest in *adopting* J.R.S. Since this proceeding is an adoption, any interest in simply taking J.R.S. into one's home is irrelevant. Were the Village of Chalkyitsik in fact acting in a representative capacity, I could accept its assertions on behalf of protected persons.

