CATHOLIC SOCIAL SERVICES, INC.,
C.G. and S.G., Appellants,

v.

C.A.A. and Cook Inlet Tribal
Council, Appellees.

S–2879.

Supreme Court of Alaska.

Dec. 8, 1989.

---

Robert B. Flint, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellants.

Michael Gershel, Tred Eyerly, and Carol Daniel, Alaska Legal Services Corp., Sharon Gleason, Reese, Rice & Volland, Anchorage, for appellee C.A.A.

Lloyd Benton Miller, Sonosky, Chambers, Sachse & Miller, Anchorage, for appellee Cook Inlet Tribal Council.

Philip J. McCarthy, Jr., Deputy Public Advocate, Brant McGee, Public Advocate, Anchorage, for guardian ad litem.

D. Rebecca Snow, Asst. Atty. Gen., Fairbanks, Grace Berg Schaible, Atty. Gen., Juneau, for Amicus Curiae, State of Alaska, Dept. of Health and Social Services.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

The sole issue presented in this case is whether under the Indian Child Welfare Act[1] an Indian child's tribe is entitled to notice of a proceeding for voluntary termination of parental rights. We answer this question in the negative. Congress explicitly granted intervention rights to tribes in involuntary termination proceedings, but did not do so in voluntary termination proceedings. *Compare* 25 U.S.C.A. § 1912(a) with 25 U.S.C.A. § 1913 (West 1983).

The legislative history of the Act demonstrates that this was a considered choice by Congress. Witnesses testified on both sides of the question whether notice should be required.[2] Additionally, the Bureau of Indian Affairs interpretative guidelines confirm the correctness of our view: "The Act mandates a tribal right of notice and intervention in involuntary proceedings but not in voluntary ones." Department of the Interior, Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584, at 67586 (1979).

The appellees' contention that due process requires tribal notice lacks merit. In enacting the Indian Child Welfare Act, Congress has both created and defined tribal rights in adoption and termination proceedings. The provisions of the Act which give tribes the right to notice of certain proceedings and not to others, define the scope of tribal rights. The Act strikes a balance between the sometimes conflicting interests of Indian parents, Indian children, and their tribes. We are unable to say that the fact that Congress stopped short of granting tribes the right to notice in voluntary termination proceedings is fundamentally unfair.

The judgment is REVERSED and this case is REMANDED for further proceedings.

---

1. 25 U.S.C.A. §§ 1901–1963 (West 1983).

2. *See* testimony of (1) Chief Calvin Issac, Mississippi Band of Choctaw Indians, in *Indian Child Welfare Act of 1978: Hearings Before The Subcommittee on Indian Affairs and Public Lands of the House Comm. on Interior and Insular Af-* fairs, 95th Cong., 2d Sess. 62–65 (1978); (2) Mary Jane Fales, North American Center on Adoption, *Id.* at 141–148; and (3) Sister Mary Clare, Catholic Social Services of Alaska, *Id.* at 80–90.

RABINOWITZ, Justice, dissenting.

The Indian Child Welfare Act of 1978 (ICWA) explicitly grants tribes the right to intervene in any State court proceeding for the termination of parental rights to an Indian child. 25 U.S.C. § 1911(c). This right to intervene is fundamental to the ICWA's purpose, and confers upon tribes an implicit right to notice of any proceeding within the Act's scope. To hold otherwise is to misread the Act. I therefore dissent.

## I. FACTUAL BACKGROUND.

Review of the record reveals the following compelling facts.

In August 1980 an Athabascan mother, CAA, gave birth to a child, CMF. In July 1985 CAA approached Catholic Social Services (Catholic Services) for help with alcoholism and parenting skills. CAA thereafter relinquished custody of a second child, M,[1] and in April 1986 allowed Catholic Services to place CMF in foster care. In May 1986, however, CAA elected not to relinquish her parental rights to CMF, and CMF was returned to her. In June 1986 CAA informed Catholic Services that she had decided again to "give up" CMF. CAA asked Catholic Services to remove CMF from her home "as soon as possible." CAA was drinking heavily at this time and had subjected her child to physical abuse.

On June 30, 1986 CAA appeared before a probate master in a voluntary relinquishment proceeding. CAA indicated that she wanted CMF to be adopted by the Caucasian couple with whom CMF now lives (Mr. and Mrs. G). At Catholic Service's request, CAA signed a Relinquishment of Parental Rights. Catholic Services did not offer CAA the alternative consent to adoption form; neither did Catholic Services explain to CAA that Catholic Services would become CMF's legal custodian once a decree terminating CAA's parental rights was entered. Finally, Catholic Services did not inform CAA of the existence of her tribal organization, the Cook Inlet Tribal Council, or her right to be represented by her own attorney. The Cook Inlet Tribal Council (CITC) received no notice of the proceedings from any source and so did not intervene.

At the June 30 relinquishment hearing, the attorney for Catholic Services misinformed CAA that upon her signature CAA had only ten days to revoke her relinquishment of parental rights.[2] CMF remained in CAA's physical custody eleven days; CAA then physically surrendered CMF to Catholic Services, under the mistaken belief that she no longer could revoke her relinquishment of parental rights. The superior court entered a final decree terminating CAA's parental rights on July 15, 1986.

Subsequently, CAA began to put her life back together. She received assistance with her drinking problem, and in September 1986 stopped drinking and began outpatient treatment. In early 1986 CAA learned of the Cook Inlet Tribal Council through a television advertisement; she contacted the tribe for counseling and for assistance in regaining custody of CMF.

On March 26, 1987, Mr. and Mrs. G petitioned to adopt CMF, filing their petition in the relinquishment proceeding rather than commencing an independent adoption action. CAA filed a Revocation of Relinquishment the same day. CITC moved to intervene in the adoption proceeding May 7, and moved to set aside the termination decree pursuant to 25 U.S.C. § 1914. CAA and CITC raised numerous grounds for setting aside the decree including Catholic Services' failure to provide notice of the termination proceedings to the child's tribe. Thereafter the superior court issued a Memorandum Order and Decision vacating CAA's relinquishment of parental rights for Catholic Services' failure to notify the Cook Inlet Tribal Council of the voluntary relinquishment proceeding. In so holding the superior court stated in part:

The tribe's right to intervene as provided by the statute would be hollow and

---

1. CAA's relinquishment of M is not on appeal.

2. CAA was in fact entitled to revoke her relinquishment for any reason prior to the entry of a final decree of termination. *See* 25 U.S.C. § 1913(c); *In the Matter of J.R.S.,* 690 P.2d 10, 14 (Alaska 1984).

without practical effect if there was not a duty imposed upon the court to ensure that the tribe in fact, had been notified and given the opportunity to respond as is required in an involuntary termination proceeding.

This appeal followed.

## II. THE TRIBE'S RIGHT TO INTERVENTION UNDER § 1911.

In my opinion the court erroneously concludes that Congress did not grant tribes the right to intervene in voluntary termination proceedings. The text of 25 U.S.C. § 1911(c) is simply not supportive of the court's reading:

> In *any* State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at *any* point in the proceeding. (Emphasis supplied.)

Contrary to the court's apparent rationale, the tribe's right to intervene is not grounded upon a right to notice. Rather, the tribe has a right to intervene at any point in any State proceeding regardless of the parents' consent. This right to intervene is absolute, as an instrumental part of the jurisdictional scheme "[a]t the heart of the ICWA." *Mississippi Band of Choctaw Indians v. Holyfield,* — U.S. —, —, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29, (1989). To deny tribes this right in voluntary proceedings is to allow parents to defeat the

Congressional scheme by usurping the tribe's equal interest in the Indian child. *Id.* — U.S. at —, 109 S.Ct. at 1610 ("[T]he tribe has an interest in the child which is distinct from but on a parity with the interest of the parents.") (quoting *In re Adoption of Halloway,* 732 P.2d 962, 969–70 (Utah 1986)); *see also Holyfield,* — U.S. at —, 109 S.Ct. at 1609 ("Congress determined to subject [placements of Indian children in non-Indian homes] to the ICWA's jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents.").

## III. THE TRIBE'S RIGHT TO NOTICE.

The ICWA thus confers upon tribes an unqualified right to intervene at any point in any State court termination proceeding. The ICWA does not, however, provide an unqualified tribal right to notice in every State proceeding. Rather, while § 1912(a) sets specific criteria for tribal notice in involuntary proceedings,[3] the statute is silent regarding notice to tribes when the State court deems the termination proceeding voluntary. Therefore we must look to the purpose of the statute to ascertain what Congress intended. *Cf. Holyfield,* — U.S. at —, 109 S.Ct. at 1606 (quoting *United States v. Pelzer,* 312 U.S. 399, 403, 61 S.Ct. 659, 661, 85 L.Ed. 913 (1941)). As the purpose of the ICWA is no less than to help Indian tribes preserve their identity,[4] I conclude that a tribal right to notice is

---

**3.** 25 U.S.C. § 1912(a) provides:

(a) *Notice; time for commencement of proceedings; additional time for preparation*

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in the like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement

or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided,* That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

**4.** *E.g., Holyfield,* — U.S. at —, 109 S.Ct. at 1602 ("The ICWA thus ... 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.'") (quoting H.R.Rep. No. 95–1386, p. 23 (1978)) U.S.Code Cong. & Admin.News 1978, pp. 7530, 7545; 25 U.S.C. § 1901(3) ("there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children").

necessarily implicit in the tribe's fundamental and unqualified intervention right under § 1911(c).[5]

The court deduces a tribal no-right to notice in voluntary proceedings from testimony before a House Subcommittee. In my opinion Congress responded to concerns expressed for parental privacy through the provision of 25 U.S.C. § 1915, which contemplates tribal participation in placement proceedings responsive to the particular needs of the child.[6] § 1915(c) requires courts to follow tribe-set preferences, considering the preference of the Indian child or parent "[w]here appropriate," and applying the tribe's preferences while "giv[ing] weight" to parental requests for anonymity. § 1915 thus strikes a balance between parental anonymity and the tribe's interests by providing a mechanism by which the privacy of parents may be respected while the tribe's right to protect itself and its children is served. *See In the Matter of J.R.S.*, 690 P.2d 10, 14–15, 18–19 (Alaska 1984). In my view the powers given tribes by virtue of §§ 1911 and 1915

prove illusory unless the tribe is given notice of a voluntary termination proceeding.

In sum, "[i]t is in the Indian child's best interest that its relationship to the tribe be protected." *Holyfield,* —— U.S. at —— n. 24, 109 S.Ct. at 1609 n. 24 (quoting *In re Appeal in Pima County Juvenile Action No. S–903,* 130 Ariz. 202, 204, 635 P.2d 187, 189 (App.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982)). The court's opinion today disenfranchises the tribe and disinherits[7] the Indian child by two pieces of paper—a consent form, and a state judge's certificate that the parent "fully understood" the consequences of her consent. 25 U.S.C. § 1913(a). I would not read the ICWA to be so readily circumvented. I would affirm the superior court's ruling.[8]

5. *See also* 25 U.S.C. § 1911(a), (b) (detailing tribes' rights to exercise jurisdiction in custody-termination matters).

6. 25 U.S.C. § 1915 provides in part:

(a) *Adoptive placements; preferences*
In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

(b) *Foster care or preadoptive placements; criteria; preferences*
Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
(i) A member of the Indian child's extended family;
(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

(c) *Tribal resolution for different order of preference; personal preference considered; anonymity in application of preferences*
In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: *Provided,* That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.

7. I refer to the child's potential cultural, not material inheritance. *Compare Holyfield,* —— U.S. at —— n. 24, 109 S.Ct. at 1609 n. 24 ("placements in non-Indian homes deprive[ ] the child of his or her tribal and cultural heritage") (quoting Senate Rep. No. 95–597, p. 45 (1977)) *with*

AS 13.11.045(1) (posture of adopted children for interstate succession).

**8.** Given this analysis of §§ 1911 and 1915, I find it unnecessary to address CAA's argument that tribes have a due process right to notice of voluntary termination proceedings under both the Alaska and United States Constitutions.