[No. 15486-9-I.   Division One.   May 12, 1986.]

*In the Matter of* S. B. R.

*Stanley Anderson,* pro se, and *Richard Marshall Kilmer,* for appellants.

*Kafer, Good, St. Mary & Mitchell* and *Stephen Henry Good,* for respondents.

*Jack Warren Fiander* and *Russell William Busch* on behalf of the Chehalis Tribe and *Amy Louise Crewdson* on behalf of the Quinault Indian Nation, amici curiae for appellants.

WILLIAMS, J.—

Recognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people, the Congress finds—

(1) that clause 3, section 8, article I of the United States Constitution provides that "The Congress shall have Power * * * To regulate Commerce * * * with Indian tribes" and, through this and other constitutional authority, Congress has plenary power over Indian affairs;

(2) that Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 (1982).

This case involves whether, under that act, the Tulalip Indian Tribe is entitled to participate in a custody proceeding involving a Tulalip Indian child.

On May 17, 1982, Patrick and Waynetta Brown petitioned the Superior Court for Snohomish County seeking custody of S. B. R. because neither parent was a suitable

custodian. *See* RCW 26.09.180(1)(b). The petition was supported by the child's mother, Tami Pablo, who is Mrs. Brown's daughter. On June 4, 1982, Stanley Anderson, the child's father, appeared, alleging in a counterpetition seeking custody that he and his child were officially enrolled members of the Tulalip Indian Tribe and the provisions of the Indian Child Welfare Act of 1978 applied. Following a March 16, 1983 trial, at which Anderson did not appear, the Browns were awarded permanent custody. On June 6, 1984, the Tulalip Tribe moved to intervene and for vacation of the custody order. These motions were denied, and the Tulalip Tribe appealed. Subsequently, on November 20, 1984, the custody order was modified in accordance with an agreement between the Browns and Pablo that she have custody of S. B. R., but that it would automatically revert to the Browns in the event of her death, disability, or inability to maintain the child.

■ The precise issue is whether the Indian Child Welfare Act of 1978 applies to this proceeding. 25 U.S.C. § 1912(a) (1982) provides:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary:

25 U.S.C. § 1911(c) (1982) provides:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

This action was an "involuntary" proceeding because neither parent consented, under the strict requirements of 25

U.S.C. § 1913(a) (1982), to the placement of the child with the Browns. It is uncontroverted that S. B. R. is an "Indian child." *See* 25 U.S.C. § 1903(4) (1982). "Foster care placement" is defined by 25 U.S.C. § 1903(1)(i) (1982) as:

any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;

S. B. R. was removed from Anderson for temporary placement, as opposed to a permanent "adoptive placement" as defined by 25 U.S.C. § 1903(1)(iv) (1982), with the Browns. While "guardian" and "conservator" are not defined by the act, the rights acquired by the Browns as S. B. R.'s custodians under RCW 26.09.250 include them within any definition of those terms. *See Webster's Third New International Dictionary* 483, 1007 (1969); Black's Law Dictionary 378, 834 (4th rev. ed. 1968). Anderson cannot have S. B. R. returned to him upon demand, but must seek to modify the child custody decree pursuant to RCW 26.09-.260. Thus, the trial court was without jurisdiction to hold this "foster care placement" proceeding until the Tulalip Tribe received notice thereof and was permitted to intervene.

■ The Browns assert that the act does not apply to intrafamily custody disputes, citing *In re Bertelson,* ___ Mont. ___, 617 P.2d 121, 125–26 (1980) wherein it was held that the act does not apply to a custody dispute between a non–Indian parent and Indian grandparents. The language of the act makes but two exceptions; it does not apply to the custody provisions of a divorce decree nor to delinquency proceedings. 25 U.S.C. § 1903(1) (1982). A basic rule of statutory construction is that express exceptions in a statute exclude all other exceptions. *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 64 L. Ed. 2d 548, 100 S. Ct. 1905 (1980); 2A C. Sands, *Statutory Construction* § 47.11, at 145 (4th rev. ed. 1984); *see also A.B.M. v. M.H. &*

*A.H.,* 651 P.2d 1170, 1173 (Alaska 1982), *cert. denied,* 461 U.S. 914 (1983); *In re S.R.,* 323 N.W.2d 885 (S.D. 1982).

The Browns assert that the act does not apply where the child had never been a part of any Indian family relationship. *See In re Adoption of Baby Boy L.,* 231 Kan. 199, 643 P.2d 168, 175–76 (1982). Again, the language of the act contains no such exception, and the Browns have presented no compelling reason to create one. *See In re Junious M.,* 144 Cal. App. 3d 786, 193 Cal. Rptr. 40, 46 (1983).

■ The Browns also assert that the act should only be applied in light of the problem it was intended to solve— the removal of Indian children from their families by public and private social welfare agencies.[1] *See* 25 U.S.C. § 1901(4) (1982). It is unnecessary to invoke the constructional rules urged by the Browns as the congressional intent is clear on the face of the statute. *See In re Charloe,* 292 Or. 545, 640 P.2d 608, 613 (1982). It is in the Indian child's best interest that its relationship to its tribe be protected. 25 U.S.C. § 1901(3) (1982); *In re Juvenile Appeal S–903,* 130 Ariz. 202, 635 P.2d 187, 189 (Ct. App. 1981), *cert. denied,* 455 U.S. 1007 (1982). The act, therefore, provides that Indian tribes are to play a central role in custody proceedings involving Indian children. *In re Juvenile Appeal A–25525,* 136 Ariz. 528, 667 P.2d 228, 233 (Ct. App. 1983). The Browns seek to deny the Tulalip Tribe any role in determining the custody of S. B. R. If Indian tribes are to protect the values Congress recognized, they must be allowed to participate in hearings in which those values are significantly implicated. *In re J.R.S.,* 690 P.2d 10, 15 (Alaska 1984).

The order of custody is vacated, and the case remanded

---

[1] In her affidavit in support of the Browns' petition seeking custody, Pablo stated that S. B. R. had been living with the Browns for an unspecified period "as the result of an agreement that was made with [them] through the Department of Social and Health Services." The Browns, in asserting that the act should not apply to this proceeding, seem to ignore the involvement of this public social welfare agency in initially placing S. B. R. with them.

for further proceedings consistent with this opinion.

COLE, J. Pro Tem., concurs.

SWANSON, J. (dissenting)—I cannot agree with the majority's opinion that the Indian Child Welfare Act of 1978 (ICWA) mandates intervention by the Tulalip Tribe and summary vacation of the custody decree. Not only does the present factual posture render this appeal moot, but I also conclude, as did the trial judge, that the ICWA does not apply to this intrafamily child custody dispute.

That the ICWA was enacted with the express purpose:

to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, . . .

25 U.S.C. § 1902 (1982) is not in question; nor can there be any legitimate dispute that it was enacted to prevent abuses by welfare agencies and social groups, both public and private, seeking to remove Indian children from their families and their Indian environment. In such actions the procedural safeguards of the ICWA are applicable and must be made available to the Indian tribe. With that I agree wholeheartedly, but that is not this case.

The majority, by a rigid application of the ICWA, has summarily upset and overturned a custody order arrived at after observance of all procedural requirements of the ICWA except for actual notice to the tribe, but including notice to the putative father and the approval of the natural mother. We are not faced with an Indian child who was removed from his parents with no apparent justification other than to smother his cultural and paternal heritage as the tribe asserts in its brief and the majority assumes. Rather, this internal family custody dispute arises out of concern by the mother, Tami Pablo, and grandmother for the welfare of S. B. R., Tami's 5–year–old illegitimate son.

The maternal grandparents, Patrick and Waynetta Brown, had assumed the full–time care and custody of S. B. R. for more than a year because of the parents' inability to care for the child. It was only after Stanley Anderson, the child's putative father, took S. B. R. from the Browns and "gave" the child to his half–brother and sister that the grandparents commenced legal proceedings to resolve the question of the child's custody. As the majority opinion correctly recites, the child's mother supported the grandparents' petition for custody. Anderson, appearing by attorney Ric Kilmer of the Northwest Intertribal Court System, filed a counterpetition and invoked the provisions of the ICWA. Attorney Kilmer later withdrew after notice to Anderson and the case proceeded to trial on March 16, 1983. Following the taking of testimony, the court entered the following unchallenged findings of fact:

3) The natural mother of the minor child is Tami Aragon, who is the daughter of Petitioner Waynetta Brown. Tami has, since the commencement of this action, married and is now Tami Pablo. The natural father of the minor child, [S. B. R.], is Stanley Anderson.

4) [S. B. R.], the minor child in this cause, was born out of wedlock and his natural father, Stanley Anderson, has never provided any financial support for him and has a serious alcohol drinking problem. The minor child's natural mother has had an alcohol problem of her own, and has had emotional problems herself and, as a result, neither the natural father, Stanley Anderson, nor the natural mother, Tami Aragon, is a suitable custodian for the minor child.

5) Petitioners, Waynetta and Patrick Brown, have had the full time physical custody of the minor child for well over one year, and prior to that time had custody of said minor child a great deal of the time, on a part time basis.

6) Petitioner, Patrick Brown, is Indian. Both he and his wife, Petitioner, Waynetta Brown, and the minor child here are and have been regularly involved in Indian cultural activities.

7) Petitioners are of good moral character and love the minor child and wish to care for him and provide for him and see that his needs are met.

8a) The natural mother of [S. B. R.] has agreed to the Petition filed by her mother and stepfather.

8b) Before the Petitioners had the custody of [S. B. R.], he had been bounced around and had no stable environment.

9) In May, 1982, the natural father, Stanley Anderson kidnapped the minor child and "gave" said minor child to his half–brother and sister. Subsequently, in May, 1982, a restraining order was placed on Mr. Anderson and his half–brother and sister, placing the minor child in the custody of Petitioners.

10) Respondent, Stanley Anderson, never exercised visitation privileges from the time of the entry of the temporary restraining order in May, 1982, even though Petitioners and Mr. Anderson agreed, through their attorneys, in writing to visitation privileges which were to be granted to Respondent.

In May of 1984, apparently after having some misgivings, Tami signed an affidavit stating essentially that she was now married to Danny Pablo, was caring for two of his children as well as the child of their marriage, and wanted S. B. R. returned to her. This affidavit furnished to the tribe's attorney, Ric Kilmer, appears to be the basis for the tribe's motion to intervene and vacate the July 29, 1983, custody order. On October 12, 1984, the Snohomish County Superior Court considered the tribe's motion, determined that the ICWA was not applicable to this proceeding, and entered an order denying the motion to vacate and intervene. It is from this order that the tribe appeals. Thereafter on November 20, 1984, an agreement between Tami and the Browns to modify the custody order transferring legal and physical custody of the child back to Tami was formalized by the Snohomish County Superior Court.[2]

Thus, the natural mother now has S. B. R. in her custody, the previous custody order that the tribe seeks to vacate is modified, and the child's mother is satisfied with

---

[2]According to a December 5, 1984, affidavit included among the clerk's papers, Tami Pablo advised attorney Kilmer that she did not want the appeal continued because she now had custody of S. B. R. and the whole thing was getting "out of hand".

the November 20, 1984, modified order and desires that the appeal be dismissed. The only remaining vestige of any custodial right on the part of the grandparents is a right to visitation and a provision in the order that custody reverts to the grandparents upon the death or disability of the mother.

No justiciable controversy appears to remain for adjudication. The return of the child's custody to the mother has rendered this appeal moot, and I would dismiss the appeal. Appellate courts have consistently refused to review a case that has become moot. *Orwick v. Seattle,* 103 Wn.2d 249, 253, 692 P.2d 793 (1984). An exception is often made for moot cases involving matters of continuing and substantial public interest. *Zehring v. Bellevue,* 103 Wn.2d 588, 590, 694 P.2d 638 (1985); *see also In re Myers,* 105 Wn.2d 257, 261, 714 P.2d 303 (1986).

Assuming the appellant's desire for a clear judicial determination that the Tulalip Tribe should have been allowed to intervene and participate by virtue of the provisions of the ICWA involves a matter of continuing and substantial public interest, I would conclude, as did the trial judge, that the ICWA does not apply to these proceedings.

The pertinent provisions of the ICWA state:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

25 U.S.C. § 1911(c).

"Foster care placement," as defined by 25 U.S.C. § 1903-(1)(i),

> shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;

We must question whether foster care placement contem-

plates the voluntary placement by a mother of her child with her parents.[3] Can it be reasonably asserted that a "foster home or institution or the home of a guardian or conservator" means the home of the child's grandparents? *Webster's Third International Dictionary* 897 (1969) defines foster home as

> a household in which an orphaned, neglected, or delinquent child . . . is placed for care usu. with the approval of the government or of a social–service agency.

While the rights acquired by the Browns as custodians might equal those of a guardian or a conservator, the grandparents in fact are not the child's guardians or conservators; nor do the child's maternal grandparents, their home being neither a foster home nor institution, stand in the relationship of a guardian or a conservator. Furthermore, the grandparents' action for return of their grandchild, S. B. R. having been in their custody for over a year prior to his removal by the putative father (termed kidnapping by the trial court's findings of fact), did not remove the child from its parent or Indian custodian, the mother having voluntarily supported the grandparents' action.[4] I would conclude that the act by its terms does not apply.

The notice provisions of the act are limited to an "involuntary proceeding." 25 U.S.C. § 1912(a); *see also* Barsh, *The Indian Child Welfare Act of 1978: A Critical Analysis,* 31 Hastings L.J. 1287, 1305 (1980). The majority disposes of this requirement by asserting that neither parent consented to the placement of the child with the Browns. The

---

[3]Under the terms of the ICWA, Patrick Brown, an Indian, would appear to be an "Indian custodian," which is defined, among other things, as "any Indian person . . . to whom temporary physical care, custody, and control has been transferred by the parent of such child[.]" 25 U.S.C. § 1903(6).

[4]The act does not define an Indian tribe's right of intervention in terms of a "child custody proceeding." "Child custody proceeding" has a broader meaning than "foster care placement" and "termination of parental rights," 25 U.S.C. § 1903(1), and the act's drafters repeatedly distinguish the broader "child custody proceeding" from a "foster care placement." *Compare, e.g.,* 25 U.S.C. § 1911(a) *with* §§ 1911(b) and (c).

trial court specifically found that "[t]he natural mother of [S. B. R.] has agreed to the Petition filed by her mother and stepfather." Finding of fact 8(a). Although it contains no definition of what constitutes an "involuntary proceeding", the act appears to contemplate an action by public and private agencies against an Indian family seeking removal of the child from the family. *See In re Bertelson*, __ Mont. __, 617 P.2d 121, 125 (1980).[5] Such an action would certainly be involuntary as to the respondents. Here, however, both the maternal grandparents and the putative father affirmatively petitioned for custody.

Although appellants seek to discredit the holding by the Montana Supreme Court in *In re Bertelson, supra* at 617 P.2d 125, that a child custody dispute involving a non–Indian mother and Indian paternal grandparents did not fall within the ambit of the ICWA, I find that court's reasoning persuasive:

> The Act is not directed at disputes between Indian families regarding custody of Indian children; rather, its intent is to preserve Indian culture values under circumstances in which an Indian child is placed in a foster home or other protective institution.

In *In re Adoption of Baby Boy L.,* 231 Kan. 199, 643 P.2d 168 (1982), the Kansas Supreme Court held that the ICWA did not apply to adoption proceedings involving a non–Indian mother's illegitimate child. The child had never been in the Indian father's custody so that the issue of preservation of an Indian family was not involved. On such facts the Kansas court denied the Kiowa Tribe, the child's Indian father, and the paternal grandparents the right to intervene in such proceedings. In rejecting the act's application, the court relied upon its legislative history and upon congressional intent:

---

[5]The congressional findings in support of the act state: "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non–Indian foster and adoptive homes and institutions; . . ." 25 U.S.C. § 1901(4).

A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment.

*In re Baby Boy L., supra* at 205–06. Similarly, in this case the maternal grandparents brought the custody action not to remove S. B. R. from an Indian family or an Indian environment but to preserve the status quo with custody as it had been for over a year. As the maternal grandmother's July 30, 1984, affidavit makes clear,

Everything that I have done and my husband, Pat, has done regarding the custody of little [S.] has been for the benefit of our daughter, Tami, and for little [S.]. It has never been our intention to permanently have little [S.'s] custody. We have always told Tami and have advised the Court that our intention was to have little [S.] returned to his mother when she was able to get her own life in order.

I would conclude, along with the courts of Montana and Kansas in considering the act's applicability to substantially similar factual circumstances, that the ICWA does not apply to a custody dispute such as this and would affirm the trial court.

Review denied by Supreme Court September 2, 1986.