[No. 57975-0.   En Banc.   March 5, 1992.]

*In the Matter of the Adoption of* INFANT BOY CREWS.

TAMMY LEE CREWS, ET AL, *Petitioners,* v. HOPE SERVICES, ET AL, *Respondents.*

*Goodwin, Grutz & Scott,* by *Daniel R. Fjelstad,* for petitioner Crews.

*Mary Parks,* for petitioner Choctaw Nation.

*McGavick, Graves, Beale & McNerthney,* by *Edward R. Lindstrom; Dubuar, Lirhus & Engel,* by *Albert G. Lirhus* and *Andrew L. Benjamin,* for respondents.

*Michele Hinz,* as guardian ad litem.

*Richard M. Kilmer* on behalf of Northwest Intertribal Court System, amicus curiae for petitioners.

*Kenneth O. Eikenberry, Attorney General,* and *Lee Ann Miller, Senior Counsel,* amicus curiae for petitioners.

DOLLIVER, J. — Tammy Crews (Crews) began dating Charles Bertiaux in May 1986 and learned she was pregnant in August 1988. At that time, Crews was single, 22 years old and living with her parents, Weldon and Arlene Crews, in Seattle, Washington, where she grew up. In considering the possible adoption of the baby, Crews contacted Hope Services, a private adoption agency, in September 1988.

During the following months, Crews received counseling from Mary Struck, a Hope Services counselor. After much consideration, including reading literature, talking with other birth mothers, and consulting her parents, Bertiaux's parents, friends, a clergyman, and various relatives, Crews elected to place her baby for adoption. Crews and Bertiaux then selected the adoptive parents, Rick and Sharon Shaffer, met with them on several occasions, and made assurances to the Shaffers that they were resolute in their decision to place the baby for adoption.

In preparation for the adoption, Struck asked Crews and Bertiaux whether either of them had any Indian ancestry. There is a dispute in the record regarding the content of the conversations between Crews and Struck relating to information about the baby's Indian ancestry.

Crews submitted an affidavit alleging that Struck asked her if she had any Indian blood. Crews alleges she told Struck that she did have Indian blood, "but . . . didn't know how much". In her affidavit, Struck stated:

> The issue of ethnic heritage was discussed and it was clear to me [Mary Struck] that the Indian Child Welfare Act did not apply. [Crews] was not a member of a tribe and in fact could not name any Indian tribes in her heritage.

Bertiaux submitted an affidavit alleging that Crews stated "she was not sure if she had any Indian blood or how much" and " 'even if there is some [Indian blood on her mother's side], it isn't enough to make a difference.' " Bertiaux also alleges that Crews stated, "her father's heritage is 'mainly all German'" and "that is why the paperwork says N/A for the mother's side and German for her father's side." There is no allegation that Crews or Bertiaux had or conveyed to Struck any information as to their membership or affiliation with any specific tribe.

The adoption proceeded according to Washington voluntary relinquishment and adoption law and on May 1, 1989, approximately 2 weeks before the baby was due, Crews signed a "Consent To Termination/Adoption and Waiver of Right To Receive Notice of All Proceedings". This form provides that the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 *et seq.*) was not applicable to the proceedings. The form also states the consent would not be effective until approved by the court which could occur no earlier than 48 hours after Crews signed the form or the baby was born, whichever was later. Once the consent was approved by the court, the consent could not be revoked except for fraud, duress or lack of mental competency.

Baby boy B. was born at 1:15 p.m. on May 22, 1989. On May 24, 1989, the "Order Approving Relinquishment, Terminating Parent-Child Relationship and Granting Temporary Custody" was filed, Crews was discharged, and the Shaffers took B. home.

Thereafter, Crews contacted Struck requesting the return of her baby. There is a dispute as to whether this conversation took place on May 26 or May 30. Despite the request, B. remained with the Shaffers. Crews continued her attempt to reinstate her parental rights, and in late June 1989, she contacted the Department of Social and Health Services (DSHS). Crews also sent a letter to the Bureau of Indian Affairs in Portland to obtain an outline of her family's Indian ancestry. On July 28, 1989, DSHS informed Crews that she "may have a claim" that B. was of Indian

descent. Clerk's Papers, at 70. DSHS advised that the adoption not be finalized until the Cherokee Nations of North Carolina and Oklahoma and the Choctaw and Umatilla Bands/Tribes had been contacted by Hope Services and Crews.

Hope Services contacted the tribes. The Choctaw Nation of Oklahoma responded, by letter dated July 11, 1989, that no "Certificate of Degree of Indian Blood" (CDIB) had been issued to Crews. Apparently, no responses were received from the Umatilla Tribe or the Cherokee Nations.

On August 9, 1989, the Choctaw Nation of Oklahoma responded to Weldon Crews' claim that he was a lineal descendant of one of the original enrollees of the tribe. The Director of the Indian Child Welfare Program for the Choctaw Nation confirmed Weldon Crews' ancestry and concluded:

> [B.] is eligible for enrollment with the Choctaw Nation of Oklahoma therefore the Indian Child Welfare Act will apply to this child.

On August 30, 1989, Crews filed a petition to vacate the order terminating her parental rights and to provide for visitation or a return of custody. Crews attempted to revoke her consent alleging it was obtained in violation of ICWA and/or the result of fraud, duress, or lack of mental competency. The claims for fraud, duress, and lack of mental competency were subsequently dismissed with prejudice by stipulation of counsel.

On September 20, 1989, Brenda Hampton, the Director of Tribal Membership for the Choctaw Nation, notified the attorney for Hope Services that a CDIB was issued to Crews as of September 19, 1989.

On October 25, 1989, Crews testified in a deposition that she was unaware of her Choctaw blood until after B. was born and had only researched her heritage in order to reinstate her parental rights. Crews also testified that her family does not regularly participate in any Indian practices or events. On November 13, 1989, the trial court granted summary judgment to Hope Services and dismissed Crews'

petition to invalidate the termination of her parental rights. The court held ICWA was inapplicable to invalidate the May 24 termination order because B. was not an "Indian child" under ICWA until September 19 when the CDIB was issued. The court rejected Crews' further contention that application of the state termination/adoption procedures deprived her of due process of law. Crews appealed.

On December 19, 1989, the adoption of B. by the Shaffers became final.

On March 28, 1990, the Court of Appeals granted the Choctaw Nation's motion to intervene. The Choctaw Nation contends that both Crews and B. have been members of the Choctaw Nation since birth based upon article 2, section 1 of the Choctaw Constitution, which provides:

> The Choctaw Nation shall consist of all Choctaw Indians by blood whose names appear on the final rolls of the Choctaw Nation approved pursuant to Section 2 of the Act of April 26, 1906 (34 Stat. 136) and their lineal descendants.

The Court of Appeals affirmed the trial court and held that B. did not become an Indian child under ICWA until September 19, 1989, and therefore ICWA was not applicable on May 24, 1989, when the court approved the termination of Crews' parental rights. *See In re Adoption of Crews*, 60 Wn. App. 202, 209-10, 803 P.2d 24 (1991).

Crews and the Choctaw Nation petitioned for review. The Northwest Intertribal Court System and the Attorney General on behalf of DSHS filed amicus curiae briefs supporting Crews' position. Crews' parents were denied permission to intervene on appeal and to file an amicus curiae brief. The Shaffers, Hope Services and Bertiaux oppose the petition. We affirm.

This is the first opportunity the court has had to address the application of the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq*. We undertake this task with a profound understanding of the immediate and long-lasting consequences of our decision, not only for B., but for all the parties in this case.

The issue is whether ICWA applies to invalidate a final decree terminating parental rights properly entered under state law. The parties and the Court of Appeals have focused upon the date at which B. met the definition of "Indian child" under ICWA as determinative. Thus, the arguments before this court centered upon when B. became a member or was eligible for membership in an Indian tribe. *See* 25 U.S.C. § 1903(4). We do not believe, however, that this is the decisive issue. Regardless of B.'s tribal membership or lack thereof, after careful consideration of ICWA and its legislative history, we are convinced that ICWA was not intended to apply in the situation presented by the specific facts of this case.

ICWA was enacted to counteract the large-scale separations of Indian children from their families, tribes, and culture through adoption or foster care placement, generally in non-Indian homes. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989). Surveys conducted in 1969 and 1974 by the Association on American Indian Affairs showed that 25 to 30 percent of Indian children were being separated from their families and that fully 85 to 90 percent of these children were being placed in non-Indian foster care, adoptive homes, or institutions. H.R. Rep. No. 1386, 95th Cong., 2d Sess. 9 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 7531. These separations and placements were found to be largely unwarranted resulting from a failure by child welfare services to understand the cultural differences in Indian child-rearing practices and other social and economic factors of Indian life. H.R. Rep. No. 1386, at 10-12.

These separations not only affected Indian children and their parents, but also the various Indian tribes.

> "Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. . . ."

*Holyfield*, 490 U.S. at 34 (quoting Hearings on S. 1214 Before the Subcomm. on Indian Affairs and Public Lands of

the House Comm. on Interior and Insular Affairs, 95th Cong., 2d Sess. 193 (1978)).

In enacting ICWA, Congress expressly found:

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901(4), (5). Congress declared the policy of ICWA was to

protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902.

ICWA implemented these policy goals by providing for exclusive tribal jurisdiction over custody proceedings involving Indian children who were domiciled or residing within a tribal reservation and concurrent, but presumptively, tribal jurisdiction in other cases. 25 U.S.C. § 1911(a), (b). For Indian child custody proceedings taking place in state court, ICWA provides substantive and procedural safeguards to ensure alleviation of these unwarranted separations of Indian children from their Indian families and culture. *See* 25 U.S.C. § 1901 *et seq*. For example, section 1912(d) requires that active efforts be made to "prevent the breakup of the Indian family" and section 1915(b) mandates that preferences be given to Indian environments in foster care and preadoptive placements.

The ICWA thus, in the words of the House Report accompanying it, "seeks to protect the rights of the Indian child as

an Indian and the rights of the Indian community and tribe in retaining its children in its society." It does so by establishing "a Federal policy that, where possible, an Indian child should remain in the Indian community," and by making sure that Indian child welfare determinations are not based on "a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family."

(Citations omitted.) *Holyfield*, 490 U.S. at 37 (quoting H.R. Rep. No. 1386, at 23-24). It has been stated and we agree that

the underlying thread that runs throughout the entire Act [is] to the effect that the Act is concerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family.

*In re Adoption of Baby Boy L.*, 231 Kan. 199, 206, 643 P.2d 168 (1982).

In this case, however, Crews and the Choctaw Nation ask this court to apply ICWA when B. has never been a part of an existing Indian family unit or any other Indian community. Neither Crews nor her family has ever lived on the Choctaw reservation in Oklahoma and there are no plans to relocate the family from Seattle to Oklahoma. Bertiaux, B.'s father, has no ties to any Indian tribe or community and opposes B.'s removal from his adoptive parents. Moreover, there is no allegation by Crews or the Choctaw Nation that, if custody were returned to Crews, B. would grow up in an Indian environment. To the contrary, Crews has shown no substantive interest in her Indian heritage in the past and has given no indication this will change in the future.

While B. may be an "Indian child" based on the Choctaw Constitution, we do not find an existing Indian family unit or environment from which B. was removed or to which he would be returned. To apply ICWA in this specific situation would not further the policies and purposes of ICWA. Consequently, we hold ICWA does not apply to invalidate Crews' voluntary termination of her parental rights and consent to adoption.

Other courts have held ICWA inapplicable when Indian children were not being removed from existing Indian

environments. The reasons given were (1) there was no existing Indian environment where the mother was non-Indian and the Indian father failed to establish paternity until during or after the custody proceedings, and (2) the mothers voluntarily consented to the adoptions in non-Indian environments. *See In re Adoption of T.R.M.*, 525 N.E.2d 298 (Ind. 1988), *cert. denied sub nom. J.Q. v. D.R.L.*, 490 U.S. 1069 (1989); *Claymore v. Serr*, 405 N.W.2d 650 (S.D. 1987); *In re S.A.M.*, 703 S.W.2d 603, 608 (Mo. Ct. App. 1986); *In re Adoption of Baby Boy D*, 742 P.2d 1059, 1063-64 (Okla. 1985), *cert. denied sub nom. Harjo v. Duello*, 484 U.S. 1072 (1988); *In re Adoption of Baby Boy L.*, 231 Kan. at 205-06. *But see In re Adoption of Baade*, 462 N.W.2d 485, 490 (S.D. 1990); *In re Adoption of Child of Indian Heritage*, 111 N.J. 155, 169-70, 543 A.2d 925 (1988); *In re S.B.R.*, 43 Wn. App. 622, 719 P.2d 154, *review denied*, 108 Wn.2d 1009 (1986); *In re Adoption of Lindsay C.*, 229 Cal. App. 3d 404, 280 Cal. Rptr. 194 (1991).

The most recent Supreme Court decision relative to the application of ICWA is *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989). In *Holyfield*, illegitimate twins were born to parents who were enrolled members of the Choctaw Tribe and residents of the Choctaw reservation in Mississippi. The parents consented to the twins' adoption by a non-Indian couple. After the adoption decree was entered in a county court, the tribe moved to vacate the adoption decree on the grounds that the tribal court had exclusive jurisdiction over the proceeding. The court denied the motion and the Mississippi Supreme Court affirmed, emphasizing that the twins had never been physically present on the reservation, were voluntarily surrendered, and the parents went to some effort to place the twins in a non-Indian environment.

The United States Supreme Court reversed holding the tribe had exclusive jurisdiction because the twins assumed the domiciliary of the mother. The Court stated the application of ICWA could not be defeated by the actions of the

parents. In so holding, however, the Court made clear that the purpose of ICWA was to avoid the

"[r]emoval of Indian children from their cultural setting [because such removal] seriously impacts a long-term tribal survival and has damaging social and psychological impact on many individual Indian children."

*Holyfield*, 490 U.S. at 50 (quoting S. Rep. No. 597, 95th Cong., 1st Sess. 52 (1977)). Thus, *Holyfield* supports our conviction that ICWA is not applicable when an Indian child is not being removed from an Indian cultural setting, the natural parents have no substantive ties to a specific tribe, and neither the parents nor their families have resided or plan to reside within a tribal reservation. In such a situation, whether or when a child meets the definition of "Indian child" under ICWA is not controlling.

We are not unmindful that prior abusive child welfare practices may have cut off large numbers of persons from their Indian heritage. *See Holyfield*, 490 U.S. at 37, 50 n.24. Furthermore, there may be instances where the application of ICWA would result in the placement of an Indian child back into an Indian environment. This is not the case before us. It is within the narrow circumstances presented by the specific facts of this case that we find ICWA not applicable.

However, even if ICWA were applicable to this case, its provisions would not invalidate the termination of Crews' parental rights.

■ Courts cut off a parent's right to withdraw consent once a final decree of termination is entered even if the adoption is not yet final. *See In re Kiogima*, 189 Mich. App. 6, 9-13, 472 N.W.2d 13, 14-16 (1991); *B.R.T. v. Executive Director*, 391 N.W.2d 594, 599 (N.D. 1986); *In re J.R.S.*, 690 P.2d 10, 12-13 (Alaska 1984). The holdings in these cases are based upon section 1913(c) of ICWA, which provides:

In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent.

We concur with the interpretation of this section adopted by the *Kiogima*, *B.R.T.*, and *J.R.S.* courts:

> The consent [§ 1913(c)] refers to may be one of two kinds: a consent to termination of parental rights or a consent to adoptive placement. A consent to termination may be withdrawn at any time before a final decree of termination is entered; a consent to adoption at any time before a final decree of adoption. *If Congress had intended consents to termination to be revocable at any time [prior to] entry of a final decree of adoption, the words "as the case may be" would not appear in the statute.*

*Kiogima*, 189 Mich. App. at 12 (quoting *J.R.S.*, 690 P.2d at 14); *B.R.T.*, 391 N.W.2d at 599 (quoting *J.R.S.*, 690 P.2d at 14).

Crews and the Choctaw Nation argue, however, that B.'s actual Indian ancestry was not known until after the court approved the termination of Crews' parental rights because either Hope Services or the court breached its duty to investigate Crews' Indian ancestry.

WAC 388-73-044(7) provides:

> When foster care or adoptive placement of a nonenrolled Indian child is planned, agencies shall compile the Portland area office of the bureau of Indian affairs' form "family ancestry chart," or appropriate equivalent. Agencies shall take appropriate steps to enroll eligible children in their respective tribes.

"Indian child" is not defined in the Washington Administrative Code; instead "Indian" is more broadly defined as:

> (a) An enrolled Indian:
> (i) Any person who is enrolled or eligible for enrollment in a recognized tribe.
>
> . . . .
> (c) An unenrolled Indian: A person considered to be an Indian by a federally or nonfederally recognized Indian tribe or urban Indian/Alaskan native community organization.

WAC 388-73-044(2). The Bureau of Indian Affairs guidelines obligate state courts to "seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe" if the court "has reason to believe a child involved in a child custody proceeding is an Indian". From the context

of the guideline, this duty attaches in voluntary as well as involuntary proceedings. A court has such a "reason to believe" when:

> Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

*Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed. Reg. 67,584, 67,586 (1979).

The one court which has addressed this issue has stated in dicta that if Indian child status is not known due to a failure to disclose information regarding the child's ancestry and the petitioner is prejudiced thereby, even an adoption decree may be challenged. *See In re Adoption of Child of Indian Heritage*, 111 N.J. 155, 187-89, 543 A.2d 925 (1988).

In this case, however, neither Hope Services nor the court had a duty to investigate Crews' Indian ancestry based upon the sparse information Crews and Bertiaux provided to Struck.

The affidavits of Crews, Struck, and Bertiaux differ in their account of the conversation regarding the parents' Indian ancestry. However, what is not disputed is that Crews told Struck that she had Indian blood but did not know how much. As stated by the Court of Appeals:

> [T]he information imparted to Struck by Crews did not suggest that B. was eligible for enrollment in a recognized tribe. Crews' statements failed to suggest any relationship with an identifiable tribe and gave her no positive leads to enable her to discover any tribal affiliation. . . .

*Crews*, 60 Wn. App. at 214. This is insufficient to trigger the investigative duties placed on Hope Services and the court.

Lastly, Crews contends that the termination of her parental rights was obtained in violation of due process. Crews argues her consent to the relinquishment of her parental rights cannot be presumed to be voluntary and that there must be a judicial analysis of whether this State's statutory scheme for voluntary relinquishments of parental rights comports with due process. Crews cites *In re L.S.*, 14 Kan. App. 2d 261, 788 P.2d 875 (1990) and *In re H.R.*, 581 A.2d

1141 (D.C. 1990) for the proposition that voluntary terminations are subject to due process.

However, *L.S.* involved a natural mother who had consented to the adoption, but not to the termination of her parental rights. A hearing was held to terminate her rights but the mother was not provided with the proper notice required under the statute. The court held this was a violation of the mother's due process rights. *L.S.*, 14 Kan. App. 2d at 262-65. *H.R.* involved a due process challenge by a father whose parental rights were terminated when the natural mother relinquished her rights. *H.R.*, 581 A.2d at 1163. The court held that a state agency's actions in seeking the termination of the father's rights before the baby was born and placing the baby with the adoptive parents without his consent constituted state action.

In this case, this State's procedures for voluntary terminations were followed and Crews, herself, consented to the termination of her parental rights. In such a situation there is no state action and due process is not implicated. *See In re Adoption of Hernandez*, 25 Wn. App. 447, 607 P.2d 879 (1980).

We affirm the Court of Appeals decision upholding the trial court's grant of summary judgment in favor of the Shaffers and dismissing Crews' petition to revoke her consent to the termination of her parental rights.

UTTER, SMITH, GUY, and JOHNSON, JJ., concur.

ANDERSEN, J. (concurring) — I agree with the majority opinion that the Court of Appeals decision is correct and should be affirmed. I disagree, however, with the majority's conclusion that the Indian Child Welfare Act of 1978 (the Act) applies only in those cases in which a state court determines that the cultural awareness, tribal affiliation, or lifestyle of the birth family meets some judicially fashioned level of "Indian-ness".

I read the Act as applying in all relinquishment cases in which an "Indian child" (as defined by the Act) is involved, regardless of the child's previous exposure to tribal culture and traditions. This is because the Act itself clearly and explicitly defines "Indian child" as a minor who

is either (a) *a member* of an Indian tribe or (b) is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe[.]

(Italics mine.) 25 U.S.C. § 1903(4).

If Infant B, with whom this case is concerned, had met this definition of the Act at the time the relinquishment order was entered, then to my view the court should have had no option but to apply the provisions of the Act. However, at that time, Infant B was *not* an "Indian child" as defined by the Act.

The Act does not apply to children who are merely of Indian descent or who have some Indian heritage. Rather, it is the child's membership in or relationship with a tribe — a political entity whose sovereignty is recognized by our federal government — that triggers application of the Act.

If Infant B was a *member* of the Choctaw Nation of Oklahoma at the time of the relinquishment hearing, or if he was eligible for membership *and* if his birth mother was a *member* of the tribe at the time of the relinquishment, then he was an "Indian child" and the Act should have been applied. I agree with the trial court and the Court of Appeals, that the child involved in this case was not an "Indian child" at the time of the relinquishment and, therefore, the Indian child welfare provisions of the Act and the state adoption statute did not apply to this proceeding.

The Choctaw Constitution states:

The Choctaw Nation of Oklahoma shall consist of all Choctaw Indians by blood whose names appear on the final rolls of the Choctaw Nation approved pursuant to Section 2 of the Act of April 26, 1906 (34 Stat. 136) and their lineal descendants.

At the trial court level the tribe, apparently interpreting this constitutional section, provided evidence that although Infant B was not a member of the tribe, he was *eligible* for

membership at the time of the relinquishment hearing. "Eligibility" alone is simply not sufficient to meet the definition of "Indian child"; the child must be both eligible for membership and the biological child of a *member* of the tribe. Although the tribe's counsel argues on appeal that the Choctaw constitutional section quoted above means that the child was a member of the tribe since birth, that position is inconsistent with the interpretation given the provision by the tribe itself. For example, the Director of the Tribal Membership Department, who is responsible for overseeing and managing the membership rolls and who has custody of the membership rolls of the Choctaw Nation, stated in an affidavit presented to the trial court that the birth mother, Tammy Crews, was

> admitted to tribal membership based upon her proof of direct blood lineage from an original enrollee of the Choctaw Nation. Her child [Infant B] *will be admitted to membership* upon the processing of necessary paperwork.

(Italics mine.) Clerk's Papers, at 16-17. The affidavit goes on to state that both Tammy Crews and Infant B were "eligible for membership in the Choctaw Nation" since birth. Clerk's Papers, at 17. A letter from the Choctaw Nation Child Welfare Program Director states that Infant B was "eligible for enrollment." Clerk's Papers, at 74. Another letter states that on September 19, 1989, the tribe issued a Certificate of Degree of Indian Blood card, showing that Tammy Crews is a member of the Choctaw Tribe. Ms. Crews has argued that she became a member of the tribe on September 19, 1989. It was on that date that Infant B was both eligible for membership *and* the biological child of a tribal member. Thus it was not until September 19, 1989, *nearly 4 months after* the legal relationship between Ms. Crews and the child came to an end, that Infant B for the first time met the statutory definition of "Indian child".

I would further hold that public policy requires the determination as to whether the Act applies to the relinquishment and adoption of a particular child to be made before or at the time the relinquishment order is entered. The

mother's change of status after her parental rights are terminated should have no effect on the infant whom she had previously relinquished voluntarily. Thus I would also add to the majority opinion by holding that the revocation provision set forth in RCW 26.33.160(4)(g)[1] (allowing the consent to adoption of an Indian child to be revoked at any time before the final decree of adoption) applies only in those cases where the child is an "Indian child" at the time the consent to adoption is approved.

It is for these reasons that I concur separately.

BRACHTENBACH and DURHAM, JJ., concur with ANDERSEN, J.

Reconsideration denied May 1, 1992.

---

[1]RCW 26.33.160 was amended by the Laws of 1991, ch. 136, § 2. The section referring to the consent to adoption of an Indian child was not changed but has been recodified and is now RCW 26.33.160(4)(h).