[No. 49606-9-I.   Division One.   August 5, 2002.]

*In the Matter of the Dependency of* Z.F.S.

CHARGE D'AFFAIRES, *as Guardian, Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*

634

*Oliver R. Davis* (of *Washington Appellate Project*), for appellant.

*Christine O. Gregoire, Attorney General,* and *Teresa B. Otsubo, Assistant,* for respondent.

COLEMAN, J. — In this dependency action, Tonya St. Clair appeals the juvenile court's decision to place her 14-month-old child with her extended relatives in Alaska. Tonya argues that the juvenile court violated section 1915(b) of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, and RCW 13.34.125 by ruling on placement without further exploring, through a home study, placement with her cousin who resides in Washington. Because the juvenile court had a tenable basis to rule out the cousin as a placement option and to determine the Alaska placement was in the child's best interests, the court did not violate the ICWA. And because Tonya failed to propose or indicate her intent to propose a voluntary adoption plan or agree to

relinquish her parental rights, RCW 13.34.125 was never triggered. We thus affirm.

## FACTS

Z.S. was born August 7, 2000. He and his mother, Tonya St. Clair, are members of the Hoonah Village of the Tlingit Indian Tribe. Tonya has been declared an incapacitated person and "Charge d'affaires" was appointed her legal guardian in March 2000. The record indicates she operates on the level of a 7- or 8-year-old and the parties agree that she will never be able to care for Z.S. herself.

A dependency petition was filed on August 9, 2000, alleging Tonya was an incapacitated person. Shortly afterwards, the Department of Social and Health Services (DSHS) and the mother's guardian looked for permanent placement for Z.S. Julie St. Clair, Tonya's mother, initially sought placement of Z.S. But she was quickly ruled out because she tested positive for methamphetamines the day of the initial shelter care hearing and there was evidence that she may have been involved in criminal drug activity. As a consequence, Z.S. was placed in local foster care with nonrelatives who were not Native American.

The Hoonah Indian Association (Association) filed a notice of intervention on November 15, 2000. During the fall of 2000, DSHS and the Association began exploring placing Z.S. with Tonya's relatives who live in Alaska. Tonya's guardian had hoped that both Tonya and Z.S. could live with these relatives together.

An agreed order of dependency was entered on March 27, 2001. Around that time, Tonya's Alaska relatives withdrew their application to provide foster care for Z.S. Thereafter, steps were taken to explore other relative placement options. By the summer of 2001, the Association had located and was pursuing placement with Mr. and Mrs. Eric Williams, different relatives of Tonya's who live in Hoonah, Alaska and who are members of the Hoonah Village of the Tlingit tribe.

On July 11, 2001, the juvenile court entered a permanency planning order, providing for a concurrent plan of adoption and dependency guardianship. The record indicates that the Association originally supported both these options, but by late summer it had ruled out a guardianship and was advocating for termination. By July 31, 2001, the Association had completed a home study of the Williams and was recommending that they adopt Z.S.

On October 3, 2001, DSHS filed a motion to have Z.S. placed with the Williams, supported by the declaration of Z.S.'s caseworker. In the declaration, the caseworker indicated that Julie St. Clair had contacted DSHS in late August 2001 to report that Donya Owens, a cousin of Tonya's who lives in Washington, "would like to raise [Z.S.]." The caseworker stated that she conferred with the Association's tribal social worker about Owens. According to the caseworker, the tribe does not recommend placement of Z.S. with Julie's relatives, because then Julie would have access to the child. "[The tribe] stated that the tribe does now [sic] want Julie to have access to the child. Because the tribe did not want the local relative placement resource option explored, I did not explore that option."

On October 9, 2001, Tonya filed an opposition to DSHS's motion, arguing that placement in Alaska would be detrimental to both mother and child because it would sever all contact between the two. Tonya requested placement with "Danya Owens," asserting that Owens is a Native American and an appropriate caregiver. Alternatively, she requested that the court order DSHS to complete a home study of Owens. Donya Owens submitted a declaration in support of Tonya's request stating, "When I found out that [Z.S.] was going to have to move up to Alaska without Tonya, it just didn't seem right so I found out what I could do to keep them together." Owens also stated that she is an "Alaskan native," that her father was Julie St. Clair's brother, and that she would obey any court-ordered limits on contact between Julie St. Clair and Z.S.

A hearing on DSHS's motion was held on October 10, 2001. There, DSHS questioned Owens' tribal affiliation and reiterated concerns over her relationship with Julie St. Clair. It also expressed doubts over Owens' suitability for placement. The tribal representative concurred with DSHS's request that Z.S. be placed with the Williams.

Tonya's attorney requested that the court permit Julie St. Clair and Donya Owens to attend the hearing. The court denied the request with regard to Julie but inquired whether Owens had anything to say to the court about placement. The attorney responded, "I've not planned on calling her as a witness," then reiterated that DSHS should complete a home study of Owens before the court ruled on placement. At one point the attorney suggested that Tonya would be willing to relinquish her parental rights if it were determined that Owens was a suitable placement for Z.S. and stated that this would be best for Z.S. because it would avoid a termination trial.

At the close of the hearing, the juvenile court ordered placement with the Williams in Hoonah "as a permanent adoptive placement," indicating this was in Z.S.'s best interest and consistent with the ICWA.

## ANALYSIS

■■ "A placement decision in a dependency proceeding is discretionary and will be overturned on appeal only upon a showing of an abuse of discretion." *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). In determining placement, the best interests of the child are the court's paramount concern. *In re Dependency of J.B.S.*, 123 Wn.2d 1, 10, 863 P.2d 1344 (1993). The criteria for establishing the best interests of the child are not capable of exact specification because each case is largely dependent upon its own facts and circumstances. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

■■ Tonya first argues that the juvenile court violated the ICWA by placing Z.S. in Alaska. Congress passed the

ICWA to counteract the large-scale separation of Native American children from their families, tribes, and culture through adoption and foster care placement in non-Native American homes. *In re Adoption of Crews*, 118 Wn.2d 561, 567, 825 P.2d 305 (1992). The ICWA has two main goals: (1) protecting the best interests of Indian children and (2) promoting the stability and security of Indian tribes and families. *See* 25 U.S.C. § 1902. To further those goals, the ICWA provides substantive and procedural safeguards to require tribal input in dependency actions and to mandate that state courts account for tribal ties, families, and culture in all dependency decisions. *Crews*, 118 Wn.2d at 568. Preferences for preadoptive and foster care placement are set forth in 25 U.S.C. § 1915(b):

> Any child accepted for foster care or preadoptive placement[1] shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. *The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child.* In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
>
> > (i) a member of the Indian child's extended family;
> >
> > (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
> >
> > (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
> >
> > (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

(Emphasis added.)

---

[1] The ICWA defines "foster care placement" as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i). "Preadoptive placement" is defined as "the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement." 25 U.S.C. § 1903(1)(iii).

Tonya contends that the juvenile court violated the highlighted portion of § 1915(b) by placing Z.S. in Alaska when Donya Owens, a native relative who lived much closer to Tonya, was proposed for placement. She focuses on the juvenile court's failure to require DSHS to complete a home study of Owens before it placed Z.S. with the Williams. We disagree. Although it may be the better practice in many cases for courts to have the benefit of a home study before ruling on placement, nothing specifically requires this level of evidentiary inquiry before a particular placement option is ruled out. Dependency courts have broad discretion to receive and evaluate relevant evidence in order to reach a decision recognizing the welfare of the child. *In re Welfare of Becker*, 87 Wn.2d 470, 478, 553 P.2d 1339 (1976). Thus, courts are afforded flexibility to decide what level of investigation is required in a particular case and the amount of evidence needed to determine what placement is in the child's best interest.

Here, the juvenile court had information that the tribe was concerned over Owens' connection with Julie St. Clair, and that it feared Julie would use Owens to gain unfettered access to Z.S. It also was aware that Owens is a young woman caring for her own infant child and that she herself had been the subject of dependency intervention as a child. There also were questions raised over Owens' status as a Native American and whether she even had any tribal affiliation. Moreover, comments by the court signal its concern that Owens did not appear on the scene until after the parties had been searching for relative placement for over a year.[2] Despite these concerns and the juvenile court's invitation to address them, Tonya declined to have Owens testify at the hearing, explain how she was suitable for placement, express her commitment to care for Z.S. permanently, or describe her Native American heritage.

---

[2] Notably, the initial shelter care order, entered over a year before the placement hearing, required Tonya to complete a relative search form, which served to assist DSHS in finding relative placement.

These factors provided a tenable basis for the juvenile court to find that Owens was not a viable placement option for Z.S., even considering her proximity to Tonya. At the same time, the court knew that the Williams were qualified to adopt and that they were an excellent choice for permanent placement as extended relatives of Z.S. who were active members of Z.S.'s tribe. Indeed, the Williams fell squarely within the foster care and preadoptive preferences of 25 U.S.C. § 1915(b)(i)-(iii), and they had the strong backing of Z.S.'s tribe. In light of this, the court was within its discretion in ruling that the most reasonably proximate placement for Z.S., considering his best interest and the purposes of the ICWA, was with the Williams in Alaska. The juvenile court did not violate § 1915 by placing Z.S. without the benefit of a complete home study of Owens.

Tonya also argues that the juvenile court violated RCW 13.34.125 by refusing to require DSHS to investigate Owens, her adoptive preference for Z.S. Because this argument requires interpretation of the statute, we review the court's ruling de novo. *See Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994).

The goal of the statutory procedures in chapter 13.34 RCW is to resolve dependencies and termination proceedings speedily in order to allow the child to have a safe, stable, and permanent home. *See* RCW 13.34.020. RCW 13.34.125 seeks to promote early resolution of a dependency case that appears headed toward a petition to terminate parental rights. *In re Dependency of J.S.*, 111 Wn. App. 796, 802, 46 P.3d 273 (2002). RCW 13.34.125 provides:

> In those cases where an alleged father, birth parent, or parent has indicated his or her intention to make a voluntary adoption plan for the child and has agreed to the termination of his or her parental rights, the department shall follow the wishes of the alleged father, birth parent, or parent regarding the proposed adoptive placement of the child, if the court determines that the adoption is in the best interest of the child,

and the prospective adoptive parents chosen by the alleged father, birth parent, or parent are properly qualified to adopt in compliance with the standards in this chapter and chapter 26.33 RCW. If the department has filed a termination petition, an alleged father's, birth parent's or parent's preferences regarding the proposed adoptive placement of the child shall be given consideration.

The statute is unambiguous regarding DSHS's duty—it must honor the parents' wishes regarding adoptive placement if, before a termination petition is filed: (1) the parents have indicated an intent to make a voluntary adoption plan, (2) have agreed to terminate their parental rights, (3) their adoptive preference is qualified to adopt, and (4) the court finds the adoptive placement to be in the child's best interest. *J.S.*, 111 Wn. App. at 802. If a termination petition has been filed at the time of the parents' request, then DSHS need only "consider" their adoptive preference.

At the time of the October 10, 2001 hearing, a petition for termination had not yet been filed, and DSHS would be obligated to honor Tonya's wish for adoptive placement as long as the prerequisites of RCW 13.34.125 were met. Tonya contends that she invoked DSHS's mandatory duty by offering to relinquish her parental rights in exchange for DSHS's agreement to conduct a home study of Owens. We disagree that what was said at the placement hearing was sufficient to trigger RCW 13.34.125. Any reference to relinquishment was made by Tonya's attorney during argument on placement:

> So I was just asking for the courtesy of an investigation [of Donya Owens] here. In terms of this child does have the right to permanency, but if the department was willing to investigate Ms. Owens and it was determined that she was suitable, I think we could get the fastest permanency possible because my client would be willing to relinquish. We wouldn't have to go through a termination process. We wouldn't have to consider that.
>
> We could get the relinquishment probably much faster than if we proceeded by virtue of placing the child with the Williams.

My client is contesting that you're possibly going to a termination trial and even after that, Ms. Owens can make, can apply to the court to intervene and ask to be considered again. So if you're really concerned about speeding up this child's permanency, if the department investigates Ms. Owens and it is determined that she is suitable, we could possible get permanency much faster.

Any offer to relinquish was contingent upon a later finding that Owens was suitable to adopt Z.S. Moreover, rather than assert DSHS's mandatory duty to follow Tonya's wishes, the attorney sought its cooperation by asking for a home study of Owens that could eventually lead to relinquishment. The failure to mention RCW 13.34.125 and the fact that only the "courtesy" of a home study was sought are clear indications that mandatory preference statute was not contemplated at the time of the hearing. And contrary to Tonya's assertion, her guardian did not express an intent to relinquish on her behalf, nor did he indicate that ending the parent and child relationship was in Tonya's best interest. Instead, the guardian stated that contact between mother and child should continue by placing Z.S. with Owens—implying that termination was not in Tonya's best interest.[3] We thus read the comments made at the placement hearing as more akin to a preliminary offer to negotiate a settlement of the case than an express agreement to relinquish Tonya's parental rights.

Equally telling is the lack of a voluntary adoption plan, expression of intent to submit such a plan, or a commitment from Owens to adopt Z.S. Instead, Owens presented herself as a way to allow Z.S. and Tonya to remain in contact. Neither she nor Tonya provided any other information about her suitability for adoption despite the opportunity for doing so at the placement hearing.

RCW 13.34.125 is less than clear as to precisely what parents must do to obligate DSHS to follow their adoption preferences. *See J.S.*, 111 Wn. App. at 807. But the statute's

---

[3] *See* RCW 11.92.043(4) (requiring court-appointed guardian for incapacitated person to assert the legal rights and "best interest" of incapacitated person).

language indicates that the legislature contemplated more from a parent than the passing reference to possible relinquishment that was made in this case. Tonya neither "indicated her [intention] to make a voluntary adoption plan" nor had she or her guardian "agreed to the termination of [her] parental rights." Instead, her attorney simply offered up a possible settlement scenario in the event that DSHS would agree to further explore her placement preference. The juvenile court did not violate RCW 13.34.125 because it was not invoked.[4]

We thus affirm the juvenile court's placement ruling.

KENNEDY and APPELWICK, JJ., concur.

---

[4] In light of this, we need not further address ambiguities in RCW 13.34.125 recently identified in *J.S.*, 111 Wn. App. at 807.